# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　Plaintiff,<br><br>vs.<br><br>TYRONE TRAYLOR,<br><br>　　　　　　　　Defendants. | Case No. 2:10-cr-00429-RLH-PAL<br><br>**REPORT OF FINDINGS AND RECOMMENDATION**<br><br>(Mtn to Suppress - Dkt. #31) |

The court conducted an evidentiary hearing on Defendant Tyrone Traylor's Motion to Suppress (Dkt. #31), on August 8, 2011. Paul Riddle and Jonathan Sussman were present on behalf of Mr. Traylor, and Andrew Duncan appeared on behalf of the government. The court has considered the Motion, the government's Response (Dkt. #32), Traylor's Reply (Dkt. #34), and the testimony adduced at the evidentiary hearing.

## BACKGROUND

The Defendant, Tyrone Traylor ("Traylor") is charged in an Indictment returned August 24, 2010 (Dkt. #1) with Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2). The Indictment arises out of a traffic stop conducted at 3:45 a.m., on July 21, 2010, by officers of the Las Vegas Metropolitan Police Department ("LVMPD"). Traylor was driving a blue Chevrolet Cavalier which belonged to his then-girlfriend, Shelanda Newsome, who was a passenger in the vehicle.

**I.    The Parties' Positions.**

　　**A.    Defendant's Motion to Suppress (Dkt. #31).**

In the current motion, Traylor seeks to suppress all testimonial and tangible evidence seized during the course of the stop. Traylor argues his Fourth and Fifth Amendment rights to due process

1  were violated because the officers lacked probable cause to stop the vehicle and conducted a custodial
2  interrogation before reading Traylor his *Miranda* rights.

3    **B.** **The Government's Response (Dkt. #32).**

4    The government opposes the motion asserting LVMPD Officers Peck and Schallipp had
5  probable cause to stop the Defendant's vehicle after observing the vehicle swerve multiple times and
6  failing to maintain a travel lane as it traveled southbound on Swenson in Las Vegas, Nevada. The
7  government argues that at the time of the stop, the officers had facts and circumstances within their
8  knowledge sufficient to warrant a prudent person in believing that Traylor had committed or was
9  committing a violation of the traffic laws. Specifically, the officers had probable cause to believe
10 Traylor had violated Nevada Revised Statute ("NRS") 484.305 which requires that drivers operate their
11 vehicle "as nearly as practicable within one lane" and "[n]ot be moved from that lane until the driver
12 has given the appropriate turn signal and ascertained that such movement can be made with safety."
13 The Supreme Court has not articulated a bright line rule for deciding when an investigative detention
14 becomes unreasonable. A reviewing court applies a totality of the circumstances test in deciding
15 whether an investigative detention has ripened into an arrest. During the course of an investigative
16 detention police officers may ask reasonable questions unrelated to the stop without converting the stop
17 into an unlawful seizure as long as the questioning does not measurably extend the duration of the stop.
18 In this case, the officers were justified in the initial questioning which lead to a consent search of
19 Traylor's person which revealed a glass smoking pipe. Traylor also acknowledged the presence of a
20 weapon in the vehicle and told Officer Schallipp where it was located. Traylor was read his *Miranda*
21 rights six minutes after his vehicle was first observed, and the officers' initial questioning did not
22 amount to custodial interrogation which required *Miranda* warnings.

23   **C.** **Defendant's Reply (Dkt. #34).**

24   Traylor replies that the search and seizure of this vehicle was unconstitutional because the
25 officers lacked probable cause to believe a violation of the traffic laws had occurred and also lacked
26 reasonable suspicion to believe Traylor was engaged in any criminal conduct. Thus, the exclusionary
27 rule should result in suppression of all tangible and testimonial evidence arising out of the stop. Traylor
28 maintains that he was in custody for purposes of the requirement to administer *Miranda* warnings

because he was deprived of his freedom of action in a significant way to a degree associated with formal arrest. Traylor argues that a reasonable person in his position would have understood that he was under the functional equivalent of a formal arrest.

## II.   The Evidentiary Hearing

### A.   Testimony of Christopher Schallipp

Officer Schallipp testified that he has been employed by LVMPD as a patrol officer for approximately two years, and was previously employed by the California Highway Patrol ("CHP") for five years. He completed the CHP six-month academy and received three months of field training in traffic and DUI enforcement. When he joined LVMPD, he completed the six-month academy and three months of field training. As a CHP officer he was involved in approximately 15 traffic stops per day.

He was on duty on July 21, 2010, in an unmarked patrol car with his partner, Officer Peck. He and his partner were assigned to conduct surveillance of a possible narcotics house at an apartment complex near Sierra Vista, east of Swenson in Las Vegas. At approximately 3:40-3:45 a.m., he observed a blue Chevrolet Cavalier pass his patrol vehicle at a high rate of speed. A few minutes later, the same vehicle drove the opposite way at a high rate of speed. As a result, he and his partner decided to follow the vehicle. The blue Chevrolet turned southbound on Swenson and was observed varying its speed as it traveled. Schallipp observed the vehicle drift from the #1 lane to the #2 lane on multiple occasions as it approached the intersection of Flamingo and Swenson. The vehicle turned westbound and failed to use a turn signal. As a result, he decided to initiate a traffic stop. He estimated he had followed the vehicle for approximately two minutes before initiating the patrol vehicle's lights and sirens to make the stop.

After lights and sirens were initiated, the vehicle braked abruptly and turned southbound on Paradise without yielding to the right. The vehicle stopped in the middle of the road. Schallipp could see two occupants in the vehicle. Both were bending over and sideways. Their movements concerned him because of the possibility they were concealing weapons or narcotics. The vehicle started again and turned into Terrible Casino's parking lot on Paradise and Flamingo. The patrol car pulled behind. Both officers got out of the car approaching rapidly. No weapons were drawn, although both officers were in uniform and armed.

1    Schallipp ordered the driver to get out of the vehicle and explain why he had been stopped.
2 Schallipp did not want to give the driver time to grab or have access to something in the interior of the
3 vehicle, as the driver was observed trying to conceal something before the stop.  Schallipp took the
4 driver to the front of the vehicle after announcing he was a Metro police officer.  Officer Peck acted as
5 the cover officer and approached the car from the passenger side to control the passenger.  Schallipp
6 asked the driver whether there were any weapons or narcotics in the vehicle.  The driver hesitated and
7 then looked left and away and then down from the officer.  Schallipp could tell from the driver's
8 response that he was possibly not telling the truth.

9    Schallipp advised the driver he was pulled over for failure to maintain traffic lane and for
10 slowing and abruptly changing his speed.  Before stopping the driver, Schallipp believed he was
11 possibly impaired.  Schallipp again asked the driver if there were any weapons or narcotics in the
12 vehicle.  The driver, later identified as Defendant Traylor, responded that there were some bags in there,
13 which Schallipp took to mean narcotics.  Schallipp asked whether there was anything illegal on
14 Traylor's person, which Traylor denied.  Schallipp asked for permission to search his person, and
15 Traylor consented.  During a search of Traylor's person Schallipp felt a pipe in his right, front pants
16 pocket which he immediately recognized was drug paraphernalia.  He seized the smoking pipe but did
17 not place Traylor under arrest.  However, Traylor was being detained.  He is not required to make an
18 arrest for narcotics paraphernalia and had the discretion to issue a citation.

19    After finding the pipe, Schallipp again asked Traylor whether he had anything illegal in the car.
20 Traylor responded with words to the effect that "yeah, you're going to find it anyway", and said there
21 was a gun in his black bag inside the car.  As a result, Schallipp immediately placed Traylor in
22 handcuffs and told Peck to place the passenger in handcuffs.  Schallipp approached the vehicle to make
23 sure there were no other weapons there.  Both Traylor and his passenger, Ms. Newsome, were placed on
24 the curb while he conducted a search of the interior of the vehicle.  Schallipp went behind the driver's
25 seat and found the black bag.  Traylor told Schallipp the gun was in a compartment inside the black
26 bag.  The compartment inside the black bag contained a black case which contained gun parts.  All of
27 the parts were there, and the gun was operational.

28    Once the gun was found, both occupants of the vehicle were given *Miranda* warnings.  He

estimated *Miranda* warnings were administered at approximately three to five minutes after the initial stop. Officer Peck read *Miranda* warnings from a card LVMPD officers keep in their pocket. Schallipp stood directly across from Peck as he read *Miranda* warnings.

Schallipp made a cursory check to make sure there were no other weapons inside the vehicle or anything out in the open a passer-by could have access to. Both occupants indicated verbally they understood their rights. During a cursory sweep of the vehicle from the driver's side, Schallipp saw another firearm on the passenger seat and recovered it. He also saw the barrel of what he recognized immediately as a shotgun or a rifle protruding from under the front passenger seat. Peck was maintaining control of Traylor and Newsome while he conducted the search of the interior of the vehicle.

After the weapons were recovered, he identified Traylor by name and conducted a record search on the firearms and Traylor's identity. One of the firearms that was recovered was missing a serial number. The officers had a hard time trying to unload the shotgun recovered from the vehicle and asked Newsome if she knew how to unload it. Schallipp asked Traylor who the guns belonged to. Traylor said he knew the firearm in the black bag was his, but was not aware that the other two guns were in the car.

On cross examination, Schallipp acknowledged that the report he prepared does not state that he and his partner decided to follow the Chevrolet Cavalier because it was observed traveling at a high rate of speed. While following the vehicle, he observed it swerve multiple times across lanes, and concluded the driver might be impaired. The vehicle had dark, tinted windows and he could see shadows or outlines of people inside the vehicle. The vehicle continued to swerve and failed to maintain a traffic lane. It also accelerated and decelerated as the officers followed it. However, his report only says the vehicle slowed down, not that it accelerated rapidly while southbound on Swenson.

The vehicle came to a stop at the intersection of Swenson and Flamingo, entered the right turn lane and turned right without signaling. The vehicle was stopped just prior to the intersection of Flamingo and Paradise. He initially estimated he followed the vehicle for approximately a quarter mile. However, after defense counsel showed him a printout from MapQuest which reported the distance was approximately 9/10 of a mile, he conceded that it was probably more accurate.

Once the vehicle was pulled over and he made contact with the driver, he no longer suspected the driver was impaired. Traylor was talking normally, wasn't slurring and he did not detect the odor of alcohol. Therefore, Schallipp did not administer field sobriety tests or give Traylor a preliminary breath test.

Before the vehicle was stopped, he observed both occupants make furtive movements. They were bending over and moving from side to side and appeared to be reaching for something. These movements were not consistent with someone attempting to fasten a seatbelt. There is nothing illegal about making furtive movements, but when furtive movements are observed they put officers on alert that something illegal may be in the vehicle.

Traylor initially denied he had any weapons or narcotics in the vehicle. However, after Schallipp found the pipe in a consent search of his person, Schallipp again asked whether there were any weapons in the vehicle. This was probably the third time he had asked Traylor whether there were any weapons or narcotics in the vehicle. Traylor then stated "well, you're going to find it anyway", and that the gun was in his black bag. Schallipp did not ask Traylor for consent to seize the bag with the weapon in it. Inside the bag in the compartment Traylor described was a Kel Tec .380. Two other weapons were found in the vehicle and Traylor was charged with all three weapons but Schallipp did not know whether charges were pending against Traylor for the other two weapons that were recovered. Traylor was not cited for any traffic violation arising out of the stop.

### B. Testimony of Michael Peck.

Peck has been employed as a patrol officer for LVMPD for approximately three years. He completed the six-month police academy. In July 2010, he was assigned to patrol the Convention Center Area Command. On July 21, 2010, he was working on the graveyard shift with his partner, Officer Schallipp. Both officers were working on a directed patrol assignment, which means they were not responsible for responding to calls, but were assigned to be proactive. That night, they were assigned to surveil a known narcotics house just east of Sierra Vista and Swenson. They started their surveillance at approximately 3:00 a.m.

Peck and Schallipp broke off surveillance and decided to follow the blue Chevrolet Cavalier after seeing it two times in a short period of time driving in opposite directions. They decided to follow

the vehicle to determine if they could develop probable cause to initiate a stop. While following the vehicle, he observed it failing to maintain its traffic lane. As the officers continued to follow the vehicle, it approached the intersection of Flamingo and Swenson, turning westbound without signaling either manually or by using the turn signal. The officers continued to follow the vehicle for approximately one more block observing that it continued to fail to maintain its traffic lane. Peck thought the driver might be impaired by alcohol or some substance because of these observations. Their vehicle's lights and sirens were activated and dispatch was advised the officers were making a vehicle stop. The driver was slow to yield and stopped in the middle of the roadway.

Before the vehicle yielded, Peck observed the occupants moving around, "almost like jumping." They were moving forward and backward from the center console area. From his training and experience, the movements he observed caused him concern for officer safety. The patrol vehicle pulled in behind the Chevrolet Cavalier approximately 20-25 feet behind and off to the left one or two feet. The patrol car was positioned in this manner as an officer safety measure.

Schallipp approached the driver's side while Peck approached the passenger side. He did not recall if firearms were drawn during the encounter. Schallipp verbally engaged the driver and took the driver to the front of the unmarked patrol vehicle. Peck observed Schallipp talking to the driver but could not overhear the conversation. Traylor was later identified by name. While Schallipp was talking to Traylor, Peck served as the cover officer staying with the passenger. He was still concerned about the possibility there were weapons in the vehicle. Schallipp placed Traylor in handcuffs after telling Peck to pull the passenger out of the vehicle because Traylor said there was a firearm in the car. Schallipp instructed Peck to put Defendant on the sidewalk with the passenger. Schallipp then entered the vehicle and recovered a firearm from a black tote bag while Peck watched Traylor and the female passenger.

After the firearm was recovered from the black tote bag, Schallipp called for a supervisor and then entered the vehicle a second time. Schallipp called out that he saw a firearm in plain view on the passenger side and observed a firearm under the seat.

Peck could not recall who read Traylor *Miranda* warnings. However, the report notes that *Miranda* warnings were administered at 3:51 a.m. He estimated that this was approximately two to

three minutes after the initial stop was made. Traylor responded to *Miranda* warnings by an acknowledgment of understanding. Peck could not recall who asked Traylor questions at the scene, or what Traylor said about weapons found inside the vehicle.

On cross examination, Peck reiterated that he did not hear a lot of the conversation between Traylor and Schallipp. He reviewed his report before testifying. Peck wrote the report and relied on information Schallipp provided in the report. There is no notation in the report Traylor was speeding, or that he saw the car two times coming towards and then going away from the parked patrol vehicle, or that the car had dark-tinted windows.

He is familiar with the area in which the stop was made. He patrols it on a regular basis, He did not assume that the Chevrolet Cavalier had any connection with the narcotics activity in the apartment they were surveiling. However, he believed he had reasonable articulable suspicion when he and Schallipp decided to follow the vehicle and was trying to establish probable cause. After following the vehicle for approximately one-half block, it failed to maintain a lane.

Before the vehicle yielded to the officers' lights and sirens, he observed movement in the car. He could clearly see two human forms, but could not tell the color of their skin or whether they were male or female. He was concerned about officer safety as he always is. The passenger was not initially asked to get out of the vehicle. He made contact with her on the passenger side, but does not recall what she said. He believes Newsome eventually presented some identification as this is a normal part of a traffic stop, but he did not recall at what point this occurred. He learned the identities of both occupants of the vehicle while processing the paperwork before transporting them to jail. He believed *Miranda* warnings were administered approximately two to three minutes after the stop. *Miranda* warnings are not normally read to two suspects at the same time. The report memorializes that warnings were administered at 3:51 a.m.

The officers did not know the identities of either of the occupants when the vehicle was stopped. While Peck was serving as cover officer, he would not have let the passenger get out. Neither Traylor nor Newsome were free to leave. They were both being detained in an investigatory detention. They were handcuffed and placed on the curb outside the vehicle once the gun was recovered. No tickets were issued for any traffic infractions because he was not concerned about a misdemeanor after

evidence of felon in possession was recovered.

When asked to define what he meant by furtive movements, he responded making movements that are not typical for a typical traffic stop. In this case, the occupants were moving their upper torsos over the center console area. The furtive movements were made contemporaneously with the vehicle stop.

### C. Testimony of Shelanda Newsome

Ms. Newsome was called as a defense witness. She testified that she recalled being pulled over with Tyrone Traylor on July 21, 2010. Traylor was driving her 1986 Chevrolet Cavalier, and she was in the passenger seat. At the time, Traylor was her boyfriend, but she has not been with him for some time. She remembers this evening because it was the first time she was ever arrested. She and Traylor were pulled over in the Terrible's Casino parking lot. Before the stop, they were driving on Flamingo and Swenson. At the time, she lived in an apartment complex on Sierra Vista and Rome.

She testified that while she was in the vehicle, Traylor did not change lanes, swerve, or make a turn without signaling. Traylor did not violate any traffic laws, and did not stop in the middle of the road. The officers pulled behind her car in an unmarked Nissan Altima or Maxima. The officers were in uniform, but not the normal Metro uniform. Their weapons were drawn. The officer did not ask for Traylor's driver's license, registration or proof of insurance, or perform any field sobriety tests. The officers pulled Traylor out of the car with their guns drawn. One of the officers approached her. She saw Traylor with his hands behind his back. She also saw an officer searching Traylor behind her car. The officer had Traylor's hands behind his back. The other officer was next to her. Her car door was open and she remained seated in the passenger seat. The officer asked if Traylor did drugs. Newsome told the officer to ask Traylor herself. Newsome did not hear Traylor admit he had a gun in the car or say anything to the officers. Traylor was "frozen", like he was shocked and didn't say anything. Traylor did not consent to a search of the car.

At some point, they were both *Mirandized* when cuffed and placed on the curb when the black and white units took them to jail. The car was searched before *Miranda* warnings were administered.

On cross examination, Newsome testified that at 3:00 a.m., or 3:30 a.m., or 3:45 a.m., she was in the car with her boyfriend, Traylor. They were traveling to go handle some of her business.

Specifically, "what I had on me I was going to get money for." She clarified that she had weapons on her. Two firearms were found in the front of the car, a short-barreled shotgun, and a handgun. These were her guns and she had possession of them for a few days before the stop.

Before being stopped, she and Traylor started from her apartment where she had picked up Traylor. She ran some errands earlier in the evening with Traylor and went to the grocery store "not to make things obvious." She was meeting with someone past the Terrible's Casino to buy the firearms.

She first noticed the police behind her car on Flamingo and Paradise at the light. Her vehicle was in the turning lane, and she and Traylor "tried to figure out what to do." She was pretty concerned about what was in the car, but she was always hiding it from Traylor. She was sitting on the handgun, and it was not visible until she got up. Traylor was driving her vehicle because "I was not in no state to get my business done myself."

When asked why she and Traylor were driving in one direction and shortly thereafter, driving in the opposite direction on the same road, she testified that Traylor had "no idea where we were going or what we were doing." When asked whether she attempted to hide the two weapons on the passenger side of the vehicle when she noticed the police behind her, she testified she was already hiding them. She denied that she and Traylor made any movements inside the vehicle.

When she went to the grocery store earlier in the evening, she did not have the two weapons with her yet. When asked when she first left to start running errands, she stated it was just as it was getting dark outside, around 9:00 p.m. Right before she and Traylor were stopped, she went to get what she needed to get. Traylor was in her apartment, and not aware of what she was doing. She testified "that was my last drop of the night." When asked to clarify, she stated it had something to do with drugs. She was asked on cross examination what she was doing in the 6 ½ hours between leaving the apartment at 9:00 p.m. and when her car was pulled over. She said she went to get herself "some WICK", *i.e.* women with infants and children aid for milk and cereal for the kids. When asked what else she was doing, she invoked her Fifth Amendment privilege against self-incrimination indicating that if she answered the question truthfully, it would incriminate her.

Traylor was not with her the entire time that night. He did not need to know anything about her business. Traylor was with her when she went to the grocery store. He was her driver that night. She

testified she barely knew what time it was when they got pulled over.  She got the guns right before she and Traylor were pulled over.  She went to her neighbor's apartment and got her "little package." Traylor was in her apartment while she was getting her package.  She told Traylor she needed to go handle something and he was basically doing what she told him because he knew he was in hot water. She did not recall specifically where they were going the night they were pulled over, only that it was at an apartment just past Terrible's Casino.  She was meeting with a guy for the first time.

The police used their lights and sirens to pull the car over.  She denied making any movements stating she did not have to move the guns at all.  She denied that Traylor stopped in the middle of the road stating that he was making a left-hand turn through the light before turning into the Terrible's parking lot. The music in her car was turned up so she didn't hear the sirens, but saw the lights flashing.  She and Traylor did not say anything.  Traylor just pulled over.   When informed that one of the officers testified they observed her car passing them twice, in opposite directions and asked why, Newsome responded that there was a whole lot going on.  She was on her cell phone arguing with a female.  She was probably deciding what to do first, whether "to go whoop on the female",  or take care of her "business".  Traylor was driving because she was under the influence of Xanax.  She does not believe it impacted her ability to recall the events.  Rather, it was to relax her.  She tends to get overwhelmed and have anxiety attacks. She was coherent that night, but relaxed and took the Xanax to "take the edge off."

The first officer took Traylor away to the back of her car.  The second officer was watching her and her movements, but she was looking around and could see although she was generally seated forward.  She did not hear any words exchanged between Traylor or the officer, or any conversation at all, and believes there was none.  She did not see Traylor's mouth move.  She did not hear the police officer ask Traylor any questions.  "From the looks of it nobody said anything."

She did not recall what color the duffle bag in the car was.  The officer did not enter the glove compartment, he just grabbed the duffel bag.  They were already searching through the car, looking around while she remained in the passenger seat.  However, once they got her out of the car, they went to the duffel bag.  He also found the gun on her seat and the shotgun that was "by the mantle piece in between" the two seats.  She believed someone would have to be on her side of the car to see her two guns.  When asked whether the two guns were in plain view, she testified they were after she got up.

At some point, the officers read *Miranda* warnings. She did not recall whether she indicated she understood these rights. When asked which officer administered the *Miranda* warnings, she testified that she thought it might have been an officer from one of the black and white units, but it could have been the officer who first approached her. Traylor did not say anything when the rights were read to him. She did not give a statement to the police. She was asked a number of questions that she answered in a smart way, sarcastically, because "why would I tell on myself." She remembered one of the officers asking how to disarm the shotgun and told the officers she was not going to do his job for him.

On re-direct, she testified that she was charged and pled guilty in state court to possession of the weapons in the car. In response to further questioning by the court, she testified that she thought she had pled guilty to possessing all three weapons. However, come to find out, she pled guilty to the possession of the short-barreled shotgun charge and the other two were dismissed. The charge she pled guilty to was a "wobbler" *i.e.,* it could have been treated as a felony or a gross misdemeanor. The state district judge decided to treat it as a gross misdemeanor because she did not have a bad record, and she received probation for the offense.

## DISCUSSION

### I.   Applicable Law

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. Amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. *Katz v. United States*, 389 U.S. 347 (1967). The Fourth Amendment protects "people not places." *Id*. Evidence obtained in violation of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471 (1963).

The Fourth Amendment "prohibition against unreasonable searches and seizures extends to the investigatory stops of a vehicle." *United States v. Sigmond-Ballesteros*, 247 F.3d 943, 946 (9th Cir. 2001) (*citing United States v. Brignon-Ponce*, 422 U.S. 873, 878 (1975)). An officer making an investigatory stop of a vehicle "must have at least a reasonable suspicion of criminal misconduct before detaining a driver." *United States v. Rojas-Millan*, 234 F.3d 464, 468 (9th Cir. 2000) (*citing Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). As long as there is an objectively reasonable basis to perform a

traffic stop, the stop will be permitted by the Fourth Amendment. *United States v. Morales*, 252 F.3d 1070, 1074 (9th Cir. 2001) (*citing Whren v. United States*, 517 U.S. 806, 813 (1996)).

The Ninth Circuit defines "reasonable suspicion" as, "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Rojas-Millan*, 234 F.3d at 468-69 (*quoting United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000)). A police officer "is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also 'be grounded in objective facts and be capable of rational explanation.'" *Lopez-Soto*, 205 F.3d at 1105 (*quoting United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996)). A traffic stop made without reasonable suspicion violates the Fourth Amendment, and any evidence obtained as a result of the stop must be suppressed as the fruit of the poisonous tree. *United States v. Thomas*, 211 F.3d 1186, 1192 (9th Cir. 2000) (*citing Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).

A brief temporary detention of individuals for the limited purpose in a traffic stop constitutes a seizure for purposes of the Fourth Amendment. *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Martinez-Furerte*, 428, U.S. 543, 556 (1976); *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975); *United States v. Garcia*, 205 F.3d 1182, 1187 (9th Cir. 2000). However, a decision to stop an automobile is reasonable where the police have reasonable suspicion or probable cause to believe a traffic violation has occurred, even if the officers suspect, but lack reasonable suspicion, to believe the individual stopped is engaged in additional criminal activity. *Whren v. United States*, 517 U.S. 806, 810 (1996). This is because the United States Supreme Court has made it clear that "subjective intentions play no role in ordinary, probable-cause, Fourth Amendment analysis." *Id*. at 813.

The court found the testimony of both officers credible that they decided to follow the Chevrolet Cavalier Traylor was driving after observing it pass at a high rate of speed in one direction, and return at a high rate of speed in the opposite direction a few minutes later. The court also found the officers credible that, while they were following the vehicle, they observed Traylor failing to maintain his travel lane and failing to signal. Thus, the court finds that the officers had probable cause to conduct a traffic stop for observed traffic infractions. Although both officers initially suspected the driver of the vehicle might be impaired, Officer Schallipp testified that these suspicions were immediately dispelled when he made

contact with Traylor after the stop. Traylor was not slurring his words, did not emit an odor of alcohol, and was not exhibiting any other signs of impairment. As a result, Schallipp did not request that he perform field sobriety tests or provide a preliminary breath test. Schallipp's preliminary contact with the Defendant dispelled his suspicion that Traylor was impaired, and eliminated the need to conduct a further investigation that he was driving under the influence. The court found this testimony credible.

The testimony on the record is uncontroverted that Traylor consented to a search of his person which uncovered a glass smoking pipe which Schallipp recognized as drug paraphernalia. Traylor does not dispute that he gave consent to a search of his person. Rather, his motion argues that he was effectively arrested from the point of his initial contact with the police, and that his Fourth and Fifth Amendment rights were violated because he was subjected to custodial interrogation before *Miranda* rights were administered. His motion also maintains that the officers found a firearm in the tote bag located in the back of the vehicle behind the passenger seat in a non-consensual search of the vehicle. The motion disputes that Traylor directed the officers to the location of the firearm and ammunition. However, the record does not support Traylors claims.

*Miranda* warnings are necessary when a suspect is in custody and interrogated by police. *Thompson v. Keohane*, 516 U.S. 99, 102 (1995). Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or deprived of his freedom. *United States v. Butler*, 249 F.3d 1094, 1098 (9th Cir. 2001), (*citing Miranda v. Arizona*, 384 U.S. 436, 444 (1996). The determination of whether a person is in custody for purposes of the requirement to provide *Miranda* warnings is determined by examining the objective circumstances of the interrogation. *Stansbury v. California*, 511 U.S. 318, 322 (1994).

Questions asked of a motorist temporarily detained in a traffic stop do not require *Miranda* warnings. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). There, the Supreme Court held that persons temporarily detained in traffic stops are not "in custody" for the purposes of a requirement to administer *Miranda* warnings because of the non-coercive aspects of ordinary traffic stops. The Supreme Court reasoned that there are two features of ordinary traffic stops that mitigate the danger that a person questioned will "speak where he would not otherwise do so freely." First, the detention of a motorist during a traffic stop is "presumptively temporary and brief" and second, "the circumstances associated

with a typical traffic stop are not such that the motorist feels completely at the mercy of police." *Id*. at 438.  Traylor was not free to ignore the police presence and go about his business while the officers detained him, requested his identification and registration, and initially questioned him.  However, the court finds he was not in custody for purposes of the requirement to administer *Miranda* warnings.

       Traylor's motion to suppress denies that he made any inculpatory statements during the investigatory detention or that he consented to a search of the vehicle.  The court found Officer Schallipp's testimony credible that, after he recovered the pipe from Traylor's front pants pocket, Schallipp again asked whether Traylor had any weapons in the car and Traylor responded affirmatively.  The court found Schallipp's testimony credible that Traylor responded using words to the effect, "you're going to find it anyway" and told Schallipp that there was a gun in a black bag in the back seat behind the driver's side of the vehicle.  At the time Traylor made the statement, Ms. Newsome was still on the passenger side of the car with Officer Peck standing outside.  Schallipp opened the black bag, found the gun, announced there was a gun in the car to his partner and directed that the passenger be removed.

       Schallipp then reentered the vehicle to check for any other weapons that either Traylor or Newsome or passersby could have access to and observed two additional guns in plain view on the passenger side.  Newsome admits there were two guns on the passenger side of the vehicle that would have been visible when she got up and got out of the car.  Schallipp had probable cause to believe Traylor had violated a traffic law, temporarily detained him, and recovered an item of drug paraphernalia from his pocket, which elicited the admission that a weapon was in the car.  Additionally, before the vehicle yielded to the police lights and sirens, both officers observed the occupants making furtive movements inside the car consistent with attempting to hide something.  The court found the officers' testimony credible that they observed bending and sideways motions in the console area of the car by both occupants.  Under these circumstances, it was reasonable for Schallipp to inquire whether there were weapons or contraband in the vehicle, and upon receiving a positive response from Traylor to recover the weapon in the location Traylor described.  It was also objectively reasonable, for officer safety, to remove the passenger and search the interior of the vehicle for additional weapons.  All three weapons recovered from the vehicle were within the immediate reach of Traylor and Newsome, and therefore constituted a risk to the officers' safety.

In this case, Traylor was pulled over in a routine traffic stop and ordered to get out of the car after both officers observed the occupants making furtive movements consistent with hiding or concealing items.  Schallipp asked a moderate number of questions of Traylor to confirm or dispel his suspicions that the occupants had hidden something illegal or dangerous to the officers.  These types of questions asked of a motorist temporarily detained in a traffic stop do not require *Miranda* warnings.  Traylor initially denied that there were any weapons or contraband in the vehicle.  However, he consented to a search of his person which resulted in the discovery of the pipe, which Schallipp recognized as drug paraphernalia.  Once the pipe was found, Traylor was again asked whether there were any weapons in the vehicle.  Traylor responded using words to the effect that, "yeah, you're going to find it anyway" and said there was a gun in a compartment in a black bag inside the car behind the driver's side.  As a result, Schallipp immediately placed Traylor in handcuffs and told Peck to place the passenger in handcuffs.  The weapon was found in the black bag where Traylor said it would be found, and after securing the weapon in the black bag, Schallipp reentered the vehicle finding the hand gun on the seat of the passenger side, and long gun protruding under the seat on the passenger side.  Further investigation revealed that Traylor was a convicted felon and he was arrested on probable cause for felon in possession of a firearm.  The passenger was also arrested on probable cause for firearm violations involving the short barreled shotgun and hand gun with an obliterated serial number.

For these reasons,

**IT IS RECOMMENDED** that:

1. Defendant Tyrone Traylor's Motion to Suppress (Dkt. #31) be **DENIED**.

Dated this 30th day of August, 2011.

_____
PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE